*Decision will be entered under Rule 50.*

HOUSTON BROTHERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE T. HOUSTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PHILIP D. HOUSTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HORACE K. HOUSTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12052, 13104, 22007, 22008, 22009.
Promulgated February 4, 1931.

*Frank S. Bright, Esq., John E. Brown, Esq.,* and *James A. Councilor, C. P. A.,* for the petitioners.
*John E. Marshall, Esq.,* for the respondent.

52

OPINION.

LOVE: We will discuss the three principal issues in the order previously stated.

The first issue is whether George T. Houston was taxable on 69 per cent of the net income of the partnership of Houston Brothers for the period January 1, 1919, to August 31, 1919, as determined by the respondent, or on 41.4 per cent as contended for by that petitioner. It is petitioner's position that the difference of 27.6 per cent of such net income should be equally divided and reported by his two sons, Philip and Horace.

The applicable statute is section 218 (a) of the Revenue Act of 1918, which provides in part:

That individuals carrying on business in partnership shall be liable for income tax only in their individual capacity. There shall be included in computing the net income of *each partner his distributive share*, whether distributed or not, of the net income of the partnership for the taxable year * * *. (Italics supplied.)

Philip and Horace were listed as partners in Houston Brothers for the period January 1, 1919, to August 31, 1919, in the partnership income tax return filed for that period. George T. Houston alleged in his petition as a fact, that the " partners " in the firm for the first eight months of 1919 were himself, his two sons and his brother. At the hearing, however, it was very definitely conceded by petitioners' counsel that the evidence failed to show that Philip and Horace had been made partners in the firm with their father and uncle. We are of the opinion that this concession is harmonious with the facts and the law, for the reason that Frank B. Houston would not consent to is partner's sons being made partners in the firm. See *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, wherein the Court said, " In any such aspect it must be remembered that the attempt was not to give her any direct interest in the firm of Cohan & Harris, or if it was, it was ineffectual, because of Harris's failure to assent."

As a substitute for the first contention, counsel for petitioner, George T. Houston, then argued that we should find from the facts that Philip and Horace were at least subpartners with their father, and that their father's 69 per cent interest in the main partnership should be divided and reported by him and his two sons in the pro-

portions hereinbefore set forth. Counsel for respondent argues in his brief that this latter contention was not pleaded and can not, therefore, be considered. We do not agree with the respondent on this procedural contention. The assignment of error in the petition filed by George T. Houston on this feature of the case, is as follows:

The Commissioner has erred in apportioning to the taxpayer for the period January 1, to August 31, 1919, 69 per cent of the income of the partnership.

We think the above assignment is sufficient to support the contention now being made by this petitioner. Cf. *Seufert Brothers Co.* v. *Lucas*, 44 Fed. (2d) 528, wherein the Court held that it was not consonant with modern ideals of judicial administration to deny a taxpayer the right to have as a deduction from its gross income, a certain " loss " for the sole and only reason that the taxpayer there had pleaded the amount was deductible as a " business expense." But we can not sustain petitioner's alternative contention for the reason that the statute makes it mandatory that the net income of a partnership be taxable to the individual partners thereof, and petitioner's sons were not partners in the partnership under consideration. *Mitchel* v. *Bowers*, 15 Fed. (2d) 287; *Cohan* v. *Commissioner, supra; Harris* v. *Commissioner*, 39 Fed. (2d) 546; *Samuel J. Lidov et al.*, 16 B. T. A. 1421; and *Charles J. Leininger*, 19 B. T. A. 621. In the latter case Leininger was a partner in the Eagle Laundry Co. During the latter part of 1920 he entered into a written contract with his wife " wherein it was acknowledged that petitioner's wife had been and was a full equal partner with him in the interest in the Eagle Laundry Co., entitled to share equally in the profits and obligated to bear equally any losses. The contract was effective from the beginning of 1920." In the last paragraph of our opinion, we said:

Even if petitioner's wife be considered as a subpartner or in partnership solely with her husband, the incidence of the taxing statute would not thereby be avoided, for the income earned on the one-half interest standing in the name of C. P. Leininger would first be income to him, taxable as such before its division with his wife. See *Ormsby McKnight Mitchel*, 1 B. T. A. 143; affd., 9 Fed. (2d) 414; 15 Fed. (2d) 287.

Petitioners' alternative contention is, therefore, denied.

There is some suggestion in petitioners' brief that the instant case might be controlled by the decision of the Fourth Circuit in the case of *Cohen* v. *Commissioner*, 31 Fed. (2d) 874. In that case Cohen was a partner in several partnerships and a stockholder in a corporation. His three sons were in his employ, for which they were paid a certain salary. As a further inducement to his sons, Cohen entered into a written contract with them to credit on his books to each son, 25 per cent of all profits he received from his various businesses, which sum was to be held in trust and paid to the sons on

condition that they marry girls of a certain religious faith or reach the age of thirty-five without marrying. In case of breach, no further sums would be credited to the sons, but the sums already credited would still be held in trust until the conditions specified in the contract were fulfilled.

The court, in reversing the Board, held that the amounts so credited represented additional compensation to the three sons and, as such, was not income to the father. We do not think that the evidence introduced in the instant case establishes any such relationship as existed in the *Cohen* case. Although George T. Houston was present at the hearing, he did not testify on this feature of the case. His wife testified that she understood her sons " were to be taken into the partnership " and that they were to have a share in " their father's part of the business," effective January 1, 1919. The sons testified that it was their understanding that they were each to have a 20 per cent interest in their father's 69 per cent, but their testimony was contradictory as to whether they understood they were partners with their father and uncle, or only with their father. Their testimony was likewise contradictory as to whether they understood the 20 per cent was to be paid to them as compensation for services rendered, or as their distributive share of the profits of a partnership. No part of petitioner's 69 per cent of the profits of the partnership of Houston Brothers for the period January 1 to August 31, 1919, was credited to the sons during 1919, and there is no evidence that any part of such profits was ever paid to them. Neither is there any evidence as to what would constitute a reasonable allowance for the services rendered the partnership by the sons, or that the sons were not fully compensated for the rendition of such services. Under such circumstances, we do not think the principles enunciated in the *Cohen* case are controlling here. The respondent's determination on this issue is approved.

The second principal issue involves the determination of the March 1, 1913, fair market value of the following lands and timber:

1. 600,720,000 feet of standing timber in Washington and Sharkey Counties, Mississippi;
2. The land supporting the above 600,720,000 feet of standing timber;
3. 2,033.46 acres of cultivated land in Washington County known as the Wildwood Plantation;
4. 1,735.01 acres of cultivated land in Sharkey County known as the Gum Ridge Plantation; and
5. 11,171.50 acres of timbered and cultivated land in Itawamba and Monroe Counties, Mississippi.

The respondent determined that the March 1, 1913, fair market value of the 600,720,000 feet of standing timber was an average of $3 per thousand feet. Petitioners contend it was at least $7 per

thousand. To weigh properly all of the evidence introduced and to determine as nearly as possible what the fair market value of petitioners' timber was on the basic date in question, is no small task, for there is evidence in the record of average values for all species all the way from $1.07 per thousand feet, to $8.67 per thousand. We have found, for reasons hereinafter stated, that the fair market value of petitioners' timber on March 1, 1913, was an average of $4.93 per thousand feet.

The evidence clearly shows that, generally speaking, petitioners' timber was of a very high grade. It was ideally located from the standpoint of economical logging. A virtual network of navigable bayous spread out over the land owned by petitioners in Washington and Sharkey Counties, affording petitioners the advantage of the lower cost of logging by water. This amounted to a saving over rail logging of about $3 to $3.50 per thousand feet.

In addition to the testimony of several witnesses who testified to the quality and excellent availability of petitioners' timber, petitioners introduced the testimony of three experienced lumbermen and timbermen, who on March 1, 1913, were actually buying and selling timber in and about the area known as the Mississippi Delta. These men testified to values per thousand feet on March 1, 1913, as follows:

| Species | Hines | Brattain | Wellford |
|---|---|---|---|
| Ash | $15.00 | $9.00 | No testimony. |
| Overcup oak | 8.50 | 8.00 | $7.00 |
| Red oak | 9.25 | 8.00 | 7.00 |
| Gum | 8.00 | 5.00 | 6.00 |
| Cypress | 11.00 | 10.00 | 11.00 |
| Miscellaneous | 3.00 | 4.00 | No testimony. |
| Average | 8.67 | 7.29 | ? |

One of the witnesses for the respondent was Claude H. Rickets, the stenographer and bookkeeper on March 1, 1913, for the Crenshaw-Gary Lumber Company. The latter's plant was located at Richey, Sharkey County, Miss. The books of this company have been destroyed. Rickets testified, however, that, as well as he could remember, the books of the Crenshaw-Gary Lumber Company showed that on March 1, 1913, the latter company was paying the following prices for standing timber located in Washington and Sharkey Counties, Mississippi:

|  | M feet |
|---|---|
| Ash | $3.00 |
| Overcup oak | 1.50 |
| Red oak | 2.00 |
| Gum | 1.50 |
| Cypress | 3.00 |

Miscellaneous (question withdrawn).

In the absence of further details as to the circumstances surrounding such purchases of timber, the quality of the timber as compared with petitioners', and whether it was logged by river or by rail, in view of the large differential in the two kinds of logging, we hesitate to give more than slight weight to Rickets' testimony. Rickets did testify that the Crenshaw-Gary plant was located on the Sunflower River, and we might assume that at least some of the logging was carried on by water, but this would not help much towards curing the defects already mentioned. The Goff sale, the details of which are set forth in our findings, is subject to much the same criticism. The sale of 1,280 acres was small, in comparison with petitioners' holdings of 112,875.96 acres, and it is quite possible in a small tract of that area for the quality of the timber to be either considerably poorer or better than the general run of a tract 88 times in size. Neither are we informed whether the Goff sale was at arm's length, that is, whether it was a transaction between a willing seller not compelled to sell, and a willing buyer not compelled to buy, both having knowledge of all the material facts.

In addition to the above-mentioned evidence respecting sales, the respondent also offered the testimony of four well qualified and experienced timbermen who testified that in their opinion, petitioners' timber on March 1, 1913, had the following fair market values:

| Species | Lockwood | Gary | Griffith | Wilms |
|---|---|---|---|---|
| Ash | $5.00 | $4.25 | $8.00 | (No testimony by species.) |
| Overcup oak | 3.25 | 1.75 | 3.00 | |
| Red oak | 3.25 | 3.00 | 5.00 | |
| Gum | 2.25 | 2.00 | 1.00 | |
| Cypress | 4.00 | 4.50 | 5.00 | |
| Miscellaneous | 1.00 | .60 | 1.00 | |
| Average | 3.03 | 2.25 | 3.01 | $2.75 |

We have carefully examined the testimony of the witnesses, both for petitioners and for the respondent, and with no reflection on their reputations as expert timbermen, we are of the opinion that the witnesses for petitioners did not make sufficient allowance in their testimony for carrying charges, such as interest and taxes, whereas the respondent's witnesses did not give sufficient weight to the unusually advantageous logging facilities present all through the petitioners' holdings. With respect to carrying charges, it would make considerable difference in the market price of timber if one purchased a block of standing timber which was to be cut and sawed into lumber immediately, or whether it was purchased with the intention of cutting it within the time of 15 or 20 years. That petitioners' witness, Brattain, had in mind an immediate cut, is apparent from the following portion of his testimony on cross-examination:

Q. Now, in arriving at the values that you gave us, did you take into consideration any speculative features?

A. No, sir, only to this extent that I would consider this about the value we would have placed on it, if we had an opportunity to buy, and were buying timber, we usually endeavored to buy it at the price it was worth at the time, and we expected the increase in value to take care of carrying charges.

Q. Now, do these values represent a period for the cut basis over a period of years?

A. No, that would have been about the value it would have been worth *if cut in that year*. (Italics supplied.)

That respondent's witness, Gary, did not take into consideration petitioners' favorable logging facilities, is obvious from the following questions and answers on cross-examination:

By Mr. BRIGHT:

Q. Do you know anything about Houston Brothers' facilities in 1913 for getting any of this timber to their mill and market?

A. No, sir.

Q. The testimony that you have given has taken into consideration no factors of that kind?

A. No, sir, I was not there at that time.

Considering all the evidence and giving to each portion thereof the weight to which we think it is entitled, we believe, and so find, that the fair market value on March 1, 1913, of petitioners' standing timber in Washington and Sharkey Counties, Mississippi, is as we have set out in our findings for each species, or an average for the entire holdings of $4.93 per thousand feet. The deduction for depletion and the computations of gain or loss from the subsequent sale of such timber should be redetermined on this basis instead of the $3 value determined by the respondent.

With respect to the fair market value on March 1, 1913, of the land under timber in Washington and Sharkey Counties, Mississippi, we approve the respondent's determination. There was evidence on behalf of petitioners that this land under timber should be divided into three zones, a northern zone, a southern zone, and a middle zone; that the land in the southern zone was worth on March 1, 1913, about $15 an acre; that the land in the middle zone was worth on March 1, 1913, about $20 to $30 an acre; and that the land in the northern zone was worth on March 1, 1913, about $30 an acre. On the other hand, there was evidence introduced on behalf of the respondent that land with timber on it could not be put to any possible use; that there was no market for such land; and that in any event the fair market value for such land would not exceed $1 an acre. Under such circumstances, we do not think the respondent's determination on this issue should be disturbed.

The respondent determined that the March 1, 1913, fair market value of the Gum Ridge and Wildwood Plantations was $7.85 an acre. The evidence shows that this valuation was obviously erro-

neous. Hines, at the close of his testimony on the value of standing timber, testified that the open land on these two plantations was worth about $90 to $100 an acre on March 1, 1913. Petitioner, George T. Houston, testified that they were worth $100 per acre. F. H. Shreiner, a witness for the respondent, testified that the fair market value on March 1, 1913, of the Gum Ridge Plantation, was $30 to $40 an acre, and that on the same date the fair market value of the Wildwood Plantation was $50 an acre. Shreiner graduated from the Kansas State Agricultural College in 1910, with the degree of Bachelor of Civil Engineering. Since 1912, and up to the present time, Shreiner has been engaged in appraising farm lands in the Mississippi Delta area, including lands in Washington and Sharkey Counties. From 1912 to 1916 or 1917, he was with the Southern Abstract & Loan Company of Memphis; then until 1920 with the Guaranty Bank & Trust Company of Memphis; and from 1920 until the present time he has been appraising farm lands for the Federal Farm Loan Board. We have ascribed considerable weight to Shreiner's testimony, and after a careful consideration of all the evidence on this issue, we find that the March 1, 1913, fair market value of the Gum Ridge and Wildwood Plantations was $40 and $50 an acre, respectively.

Houston Brothers' holding in Itawamba and Monroe Counties, Mississippi, consisted of 1,008 acres of cultivated land, and 10,163.50 acres of land and timber on which all timber over 18 inches had been cut. In their General Forest Industries Questionnaire filed with the respondent, they claimed a March 1, 1913, fair market value of the entire 11,171.50 acres of $15 an acre, which value the respondent determined to be correct.

During 1919 the partnership sold substantially all its holdings in these counties at the rate of $50 an acre for the cultivated land, and $20 an acre for the remaining land and timber. Petitioners, in their brief, now claim a March 1, 1913, fair market value of $50 an acre for the cultivated land, and $35 an acre for the remaining land and timber. Petitioner, George T. Houston, was the only witness to place a value on the 10,163.50 acres of land and timber. For convenience, his testimony on this particular question is set out in full as follows:

Q. Now, what would you say was the value of that timber land in the 11,000 acres an acre?
A. It was worth $30 to $35. The timber on the land was worth $30 to $35.
Q. What was the land under the timber worth?
A. It was worth certainly the price we got for it.
Q. $20 would you say?
A. $18 to $20,—I do not recall exactly, except the millsite and the lumberyard site and the land we had in connection with the mill.

When consideration is given to the fact that both the land and timber in this 10,163.50-acre tract sold in 1919 for $20 an acre at a time when, as Hines testified, "stumpage would have been worth four times what it was prior to that," we do not believe that the testimony of this witness is sufficient to overcome the prima facie correctness of the respondent's determination of a March 1, 1913, value of $15 an acre.

Relative to the question of the March 1, 1913, fair market value of the 1,008 acres of cultivated land in Itawamba and Monroe Counties, we have the testimony of three witnesses, W. A. Bonds and George T. Houston for petitioners, and Shreiner for the respondent. Bonds has been in the employ of the Houstons since 1899. He testified that he would place the March 1, 1913, fair market value at $50 an acre or better. He also testified that Houston Brothers had advertised it for sale in 1913, at $50 an acre, and had been offered " $100 an acre for part of it," but did not specify the number of acres on which the offer was made. Houston testified to a value of $100 an acre, but we can not reconcile this figure with the price at which Houston Brothers were advertising the property for sale at the basic date. Shreiner said "about $10 an acre, I guess." Our criticism of Shreiner's testimony on this issue is that the territory was outside of that in which he was most familiar. We believe that on the basis of the entire record, the fair market value of the 1,008 acres of cultivated land on March 1, 1913, was $45 an acre. The profit on the sale of this land in 1919 should be recomputed accordingly.

The amount of $2,577.21 paid by the partnership in 1920 for removing certain sprouts and brush from previously cultivated land, preparatory to raising a crop of produce in 1920, was an ordinary and necessary expense of doing business and deductible from gross income under the provisions of section 214 (a) (1) of the Revenue Act of 1918.

The last issue involves the determination of the actual number of feet of timber cut from the holdings of Houston Brothers during the calendar year 1919. Houston Brothers reported, and the respondent in his determination of a deficiency against George T. Houston for the calendar year 1919, determined this figure to be 11,454,000 feet. The respondent now contends that he was in error in his determination, and that the correct number of feet cut from the holdings of Houston Brothers during the calendar year 1919, was only 6,287,908 feet. In support of his contention, he offered in evidence certain sheets taken from the partnership's books of account, with information and facts recorded in columns captioned as follows: " Year," " Scale No.," " Stumpage," " Cutter and Hauler," " Mississippi River," " Yazoo River," " Big Sunflower River," " Little Sunflower River," " Bought at Mill," " Timber Rights," " Company Land,"

and "Railroad." All the columns beginning with the "Mississippi River " column, are further divided into subcolumns captioned: "Logs," "Feet," and "Amount." It is the respondent's position that only the number of feet shown in that column under the caption of " Company Land " may be taken as the number of feet cut during the year and this number he now determines to be 6,287,908 feet. But Philip D. Houston testified that there was considerable memoranda material in the nature of scale cards, on the back of letters, envelopes and writing paper that were never recorded on these sheets introduced by the respondent. On that state of the record, we do not think that the original figure of 11,454,000 feet should be disturbed.

The deficiencies should be redetermined in accordance with our findings of fact and opinion, and in accordance with the correct amount of depreciation agreed upon by the parties referred to in our preliminary statement of the issues.

*Judgment will be entered under Rule 50.*